# SUPREME JUDICIAL COURT

## JANUARY TERM. 1861, AT BOSTON.

PRESENT:

Hon. GEORGE T. BIGELOW, Chief Justice.
Hon. CHARLES A. DEWEY, ⎫
Hon. PLINY MERRICK, ⎪
Hon. EBENEZER R. HOAR, ⎬ Justices.
Hon. REUBEN A. CHAPMAN, ⎭

## SUFFOLK COUNTY.

### Jesse Fogg & others vs. Gustavus Griffin.
### Henry B. Williams & another vs. John Pew.

An insurance company is bound by representations in reference to the amount of its capital stock which is paid in and invested, made, in reply to the inquiries of applicants for insurance, by an agent duly appointed under its by-laws, whose business 'it is to solicit risks, receive and transmit applications, receive back and deliver policies, and receive the premiums; especially if it appears that he was expressly authorized to make the representations by officers of the company.

In an action by the assignees in insolvency of an insurance company, upon a note given for a premium, in which the defence set up in the answer is that the notes were procured through false and fraudulent representations as to the solvency of the company, and the amount of capital stock which had been paid in and invested, the defendant may prove that the funds paid in for instalments due upon subscriptions to the capital stock were immediately taken possession of by the treasurer; that no entry thereof was made in his account in the ledger of the company; that they were not deposited in the banks where the company kept its accounts; and that the shares of other corporations issued in the name of the president of the company, and which were said to have been purchased with the funds referred to, were shortly afterwards transferred by him to the persons from whom they had been received; but evidence of a rescission by the defendant of the contract under which the note was given is incompetent.

TWO ACTIONS OF CONTRACT, the first by the assignees, and the second by the surviving assignees, of the Metropolitan Fire and Marine Insurance Company, an insolvent corporation, upon four promissory notes given by the several defendants for premiums on policies of insurance issued to them by the company, on marine risks. The notes were all given in the spring of 1854.

The answer in each case alleged that the notes were given on the faith of false and fraudulent representations by the company that their capital stock was paid in and invested according to law, and that they were solvent, and were authorized to make contracts of insurance.

At the trial of the first action in the superior court, it appeared that the company was organized in 1853, and went into insolvency in January 1855, and that the plaintiffs were duly chosen assignees.

The sixth by-law of the company was as follows: " The president and secretary shall have power to make and execute contracts of insurance on behalf of the company ; also, may cancel the same whenever they shall deem it for the interest of the company to do so. They shall also have power to appoint agents, and establish the same wherever the best interests require it, in their opinion." After this by-law had been read to the jury, the defendant introduced evidence, under objection, that in November 1853 William P. Dolliver of Gloucester was appointed as an agent of the company by the president and secretary, and, in reply to inquiries made by him, was informed by those officers that the capital of the company, to the amount of $200,000, was all paid in and invested according to law; and that he was directed by them to state these facts to all applicants for insurance who should inquire of him respecting the same. Dolliver's business as agent was to solicit risks, receive and transmit applications, receive back and deliver policies, and receive notes for the premiums on marine risks, and cash for those on fire risks ; and his services were paid for by the company, by a commission on the premiums received by him.

Dolliver solicited the defendant to insure his vessels in this company, and, in reply to questions, assured him that the

capital of the company was $200,000, which was all paid in and invested according to law; and, on the strength of these assurances, the defendant applied for insurance, received his policies, and gave the notes in suit for the premiums.

In order to show that the capital of the company was never paid in and invested according to law, but that the payment and investment thereof were merely colorable, the defendant offered, amongst other evidence, the deposition of the secretary of the company, who testified that the first instalment of the capital stock was paid to him, as secretary, in May 1853, the larger share being paid by Luther Monson, the president and treasurer of the company, and that the same was immediately paid by him to Monson, as treasurer; that the second instalment was paid and disposed of in the same manner, in September 1853; and that the whole capital was paid in before the spring of 1854. He also testified that the company kept deposits only in three banks, namely, the Webster and Merchants' Banks, and the Howard Banking Company; and that he had no knowledge of what became of the money paid in for capital stock, except that in the fall of 1853 Monson produced certificates of shares in various banks and other corporations in his name, as president, in which he said he had invested the money. This evidence was objected to, but admitted.

The seventh by-law of the company was as follows: " The cash funds of the company shall be deposited in such bank or banks as the president may direct, to his credit, as president, subject to his order — he being accountable for the safe keeping and disbursement of the same." The defendant introduced, under objection, the ledger of the company, which was produced by the plaintiffs, on notice, exhibiting an account with the treasurer, for the purpose of showing that no part of the instalments of the capital stock were therein charged to him. The plaintiffs objected that this was only a current business account, not commencing until July 1853, and that it was not the proper place for such charge to appear. The defendant also introduced evidence, under objection, that no part of the instalments was deposited in either of the banks referred to. Evidence was also

offered tending to show that the investments by the president were only colorable, and that the stocks had been borrowed from persons to whom they were afterwards transferred; to which the plaintiffs objected, on the ground that, if the money received in payment for the capital stock was ever invested, the subsequent acts of the president in disposing of the shares purchased with it were immaterial; but the evidence was admitted.

The defendant also offered evidence tending to show a rescission of the contracts by him in August 1854, and that he then surrendered his policies. To this the plaintiffs objected, on the ground that the answer set up no such ground of defence; but the evidence was admitted.

Among other instructions, not necessary to be stated here, *Putnam*, J. instructed the jury that, if the notes were given on the strength of material misrepresentations by an authorized agent of the company, which were known by the president and secretary to be false, or which they had reason to believe to be false, and if the defendant, upon ascertaining the facts, rescinded the contracts, or did what he could to rescind them, on the ground of the fraud, the plaintiffs could not recover, that the burden of proof to establish these facts was upon the defendant; that the president and secretary had power to appoint Dolliver as an agent of the company, and to authorize him to make binding representations of facts to applicants that, if the defendant had satisfied them upon the other points, it was also a question for them to consider whether the defendant, within a reasonable time after the discovery by him that the representations to him were false and fraudulent, rescinded or offered to rescind the contracts on his part, and did what he could to restore the company to their former position, and whether he did this upon the sole ground of the fraud; and that, if he did this, the plaintiffs were not entitled to recover in this action; but if the defendant did not do this, then the misrepresentations, if proved, went only to the reduction of damages, and the plaintiffs would be entitled to recover what the policies were actually worth.

The jury returned a verdict for the defendant, and, in reply to

a question put by the court, said that they found that there was a rescission of the contracts by the defendant. The plaintiffs alleged exceptions.

In the second action, substantially the same facts were proved as in the former, and the same objections were made to the evidence ; and *Brigham,* J. instructed the jury that if the president and secretary of the company appointed Dolliver as an agent, and said to him that he might state to any person who applied to him for insurance that the capital of the company was $200,000, which was all paid in and invested according to law, and if Dolliver did, upon being applied to for insurance by the defendant, so state to him, and if the statement was material, false, and known by the president and secretary to be false, and was made by them to Dolliver for the purpose of enabling him, by repeating it, to procure risks from persons desiring insurance, and with intent to defraud, then a person making a contract with the company, relying upon the statement, and being induced thereby, may avoid his liability upon his contract, although none of the directors of the company was privy to the intentions or statements of the president and secretary ; that, in order to rescind the contract, the defendant must prove that he acted at once upon discovery of the fraud ; that he could not rescind upon the ground that the company had become insolvent ; that an offer to rescind must be accompanied by a statement of the ground of rescission ; and that if there was no rescission, or offer to rescind, and if they were satisfied of the fraud, the plaintiffs were entitled to recover the value of the policies, provided the company could have paid the same at the time when, by the terms of the policies, the sums insured would, in case of loss have become due and payable.

The jury returned a verdict for the defendant, and the plaintiffs alleged exceptions.

The two cases were argued together.

*W. R. P. Washburn,* for the plaintiffs.

*J. L. English,* for the defendants.

BIGELOW, C. J. The exceptions taken to the rulings of th

1 *

court at the trial of these cases are quite numerous, but they can be properly classed under three heads.

1. First in order is the objection to the proof of the acts and representations of Dolliver, as the agent of the corporation at the time the defendants procured their policies. To the competency of this evidence we can see no valid objection. He was duly appointed to act in behalf of the corporation by the president and secretary under the sixth by-law, and had authority to make contracts of insurance, which should be binding on the company if duly ratified. It was clearly within the scope of his authority to answer inquiries concerning the condition and property of the corporation, and its ability to fulfil its contracts with those who were about to accept policies, especially as it appears he was expressly authorized by the officers of the corporation to make such statements. If it be true, as urged by the counsel for the plaintiffs, that he could not bind the corporation by any false and fraudulent representations, because it had no authority to appoint an agent for an unlawful purpose or to use unlawful means, it would follow that no corporation could be held liable for any acts of its authorized agents, however fraudulent or wicked their conduct might be, or however great might be the injury thereby occasioned to third persons. Such a doctrine finds no support in the law. A corporation can act only through agents. If they, while exercising the authority conferred on them, are guilty of falsehood and fraud, their principal is liable for the consequences which may flow therefrom. The true test of the liability of the principal in such cases is to ascertain whether, in committing a fraud, the agent was acting in the business of his principal. If he was engaged in the course of his employment, then parties injured by his misconduct or fraud can resort for redress to the persons who clothed him with the power to act in their behalf, and who have received the benefits resulting from his agency. *Foster* v. *Essex Bank*, 17 Mass. 479, 509. *Fuller* v. *Wilson*, 3 Ad. & El. N. S. 58. Story on Agency, § 308.

2. The evidence relating to the mode of paying in the capital stock; concerning the entries in the books of the corporation,

and the omission therein of any account of the sums of money purporting to have been paid in as the capital of the company; of the manner in which stock in various banks and other corporations was transferred to the president of this corporation and reconveyed by him subsequently, and of other similar facts, was all competent as bearing on the issue raised by the answers. It tended to prove that the notes in suit had been obtained from the defendants by false and fraudulent representations concerning the solvency of the corporation, its ability to meet its liabilities, the amount of its capital stock, and the mode of its investment. The issue was a very broad and comprehensive one, and opened an inquiry into the entire transactions of the corporation, from its organization to the time when the alleged false representations were made to the defendants. By no other means could the jury determine whether the defence set up to the notes in controversy was well founded. Taken by itself, each fact offered in evidence might seem remote or immaterial to the inquiry. But it often happens, especially when questions of fraud are the subject of investigation, that circumstances which, viewed separately and apart from each other, seem to be slight and irrelevant, when connected together and combined in a chain of evidence, afford irresistible proof of the issue which they are adduced to establish.

3. All the instructions given to the jury seem to have been accurate and well adapted to the facts in proof, and sufficiently full to enable the jury to pass intelligently on the rights of the parties, except that which related to the alleged rescission of the contracts of insurance. This ground of defence was not open to the defendants under their answer, and, the objection having been seasonably taken, the evidence in its support should have been excluded, or the jury told that they could not consider it in making up their verdict. It is a mistake to suppose that a defence to a contract on the ground that it was obtained through fraud is identical with one which alleges that the contract was rescinded. The former admits the existence of the contract, but seeks to avoid it, in whole or in part, by proof of facts to which the law gives efficacy according to their legal

effect on the rights of the parties. But it does not necessarily defeat the action, or prevent the party who relies on the contract from maintaining his action and recovering such damages for the breach thereof as he may prove to have been sustained. But it is otherwise, where the defence rests on a rescission of the contract. In such case the issue is that the contract has ceased to have any legal existence, not by reason of fraud or falsity in its inception only, but by reason of such fraud and falsity, in connection with other and distinct acts *in pais,* by which it has been terminated. If this defence is established, the action on the contract cannot be maintained. It follows that it is a distinct and substantive ground of defence, which is not embraced by a mere allegation of fraud in procuring a contract, and that it must be alleged in the answer according to the provisions of the practice act, if a defendant seeks to avail himself of it in order to defeat a recovery on a contract.

*Exceptions sustained.*